# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2863

_____

United States of America,                    *
                                             *
     Plaintiff - Appellant,                  *
                                             * Appeal from the United States
v.                                           * District Court for the Southern
                                             * District of Iowa.
Darrell Lee Devries,                         *
                                             *
     Defendant - Appellee.                   *

_____

Submitted: April 14, 2010
Filed: January 28, 2011

_____

Before BYE, JOHN R. GIBSON, and HANSEN, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

A jury convicted Darrell Devries of one count each of conspiring to manufacture methamphetamine, 21 U.S.C. §§ 841(a)(1), 846, and of manufacturing the drug, 21 U.S.C. § 841(a)(1), (b)(1)(B), 18 U.S.C. § 2. Devries moved for judgment of acquittal or, in the alternative, for a new trial on the ground that the testimony of a co-conspirator was not credible. The district court[1] denied the motion for judgment of acquittal but granted the new trial motion. The government appeals, arguing that the district court erred in its evaluation of the co-conspirator's credibility

_____

[1]The Honorable Robert W. Pratt, Chief Judge, United States District Court for the Southern District of Iowa.

and that the government presented sufficient additional evidence to sustain a verdict. We affirm.

Darrell Devries lived with his girlfriend, Kimberly Pipes, in a rented trailer in rural Indianola, Iowa. Devries also had permission to use a machine shed located on the property. On the evening of April 7, 2008, two officers from the Warren County Sheriff's Office began conducting surveillance of the trailer and shed from an adjoining property. They remained until 4:00 or 4:30 on the morning of April 8. A white pickup truck, which they determined was registered to Sheila Mosset, was parked on the property when the officers arrived. The only people they saw throughout their surveillance were Devries and Chris Mosset, Sheila Mosset's husband.

The first activity the officers saw was the white pickup truck leaving at about midnight. Approximately thirty minutes later the pickup returned, followed by a "monster truck." The pickup parked next to the machine shed and the monster truck parked in the shed, entering through a roll-up door. Chris Mosset was driving the white pickup truck when it returned, and Devries was driving the monster truck. Although the officers watched them move about during the next few hours, they could not tell exactly what the two men were doing because they could not see inside the machine shed or the trailer. However, one of the officers testified that they observed what he believed to be the methamphetamine cooking process. As an example, he noted that the doors on the back side of the shed were open, which would allow fumes to escape. They saw one of the two men walk out a door of the shed with what appeared to be a cooler, and they heard banging noises consistent with emptying such a container. They also heard a loud motor and saw smoke rising from a smokestack in the shed.

At about 4:00 or 4:30 a.m., the officers heard a vehicle and saw the taillights of Mosset's truck as it was leaving the property. Another officer was alerted and asked

to make a traffic stop of the truck. When the officer did so, he noticed a strong chemical odor coming from the cab, one he associated with the manufacture of methamphetamine. He checked the status of Mosset's driver's license and learned it was suspended, so he placed him under arrest and searched his vehicle subject to the arrest. He found some coffee filters and two baggies with a white powdery substance, which was later determined to be methamphetamine. The officer testified that Mosset was nervous, but his behavior was not that of a person who had been using methamphetamine.

On April 8, the officers obtained and executed a search warrant for the property. They found a number of items in the trailer associated with methamphetamine production and use, such as a digital scale, packaging materials, and a glass methamphetamine pipe. The only measurable drug found in the trailer was cocaine. There was no usable quantity of methamphetamine in the trailer. A baggie with residue of some sort of drug was found in the pocket of female pants. In the shed, they found a sludge ball and other items associated with methamphetamine production.[2] However, officers did not fingerprint any item other than a coffee grinder, which had no identifiable prints. Finally, Devries also had a semi tractor trailer parked on the property, and a search of that trailer yielded a tank and hose with the smell of anhydrous ammonia emanating from the tank and trailer.

Two witnesses testified that they purchased pseudoephedrine for Mosset to use in making methamphetamine. Sheila Mosset bought the pills for her husband in return for methamphetamine, and her uncle, John Domino, did the same. The government also introduced logs showing that Chris Mosset and Kimberly Pipes, Devries's

---

[2] A sludge ball is a leftover product from the methamphetamine manufacturing process that contains diluted amounts of methamphetamine that can be extracted by putting more solvent in the mixture. A pull is the process of adding the solvent and making additional methamphetamine, and both the quantity and quality of the drug diminishes with each pull from the same sludge ball.

girlfriend, purchased the pills. No witness testified that he or she ever saw Devries manufacturing methamphetamine. Pipes is alleged to be a member of the conspiracy, as well, but she absconded before she could be subpoenaed.

Following a two-day trial, a jury returned a guilty verdict. Devries moved for judgment of acquittal both at the close of the government's case and at the close of all the evidence, and following the verdict he moved for a new trial. The district court, which had reserved ruling on the former motion, considered the two together. Although it denied the motion for judgment of acquittal, the district court granted Devries's new trial motion on the ground that the verdict was against the weight of the evidence. The government appeals, and we affirm.

I.

We review the district court's grant of Devries's new trial motion for abuse of discretion. United States v. Bertling, 510 F.3d 804, 807 (8th Cir. 2007). We give great deference to the district court when it grants a new trial motion on the ground that the verdict is against the weight of the evidence, and we reverse only upon a strong showing of abuse. United States v. Bass, 478 F.3d 948, 951 (8th Cir. 2007). In considering the motion, it is the district court's task to weigh the evidence and evaluate the witnesses' credibility to determine if a miscarriage of justice may have occurred. United States v. Davis, 103 F.3d 660, 668 (8th Cir. 1996). The district court did so in this case.

The government argues that, absent Mosset's testimony, there was sufficient physical evidence and testimony from other witnesses to support the verdict. However, the district court did not rely only on Mosset's low credibility as the basis for its decision. The district court's ruling stems largely from the inconsistency between Mosset's version of events and the evidence otherwise presented. Mosset testified that he was at his home on the evening of April 7 when Devries called him

-4-

to ask for help after Devries's truck broke down in Des Moines. Mosset then left his house between 8:00 and 9:00 p.m. to pick up Devries and take Devries to his own house to retrieve a fuel pump. According to Mosset, they returned to Devries's truck to repair it and then drove back to Devries's house around midnight, where they continued working on the truck inside the shed. In contrast, the officers who performed the surveillance testified that Mosset was present when they arrived before dusk at Devries's property.

Mosset testified that, while he and Devries worked on the truck, Mosset began doing a pull on the sludge ball. Mosset first testified that Devries was actually in the trailer when Mosset started the pull, but then said that Devries was with him in the shed but not involved in the pull on the sludge ball. Mosset next said that Devries might have held a jar while Mosset was straining the liquid, but his memory of the events was fuzzy because he had not used meth for a while and needed some. Finally, he testified that he did remember Devries helping that night by wiping out a jar, which fell and broke. Mosset said that he and Devries split the methamphetamine that night, with Devries getting 1 ½ grams, and that the methamphetamine he had when he was arrested was part of the same batch. However, the government's expert witness testified that the methamphetamine residue found in Devries's trailer did not come from the same batch as the contents of one of the baggies that had been taken from Mosset upon his arrest. She also testified that the contents of one of Mosset's baggies could not have come from the sludge ball found on the property.

The district court noted the tenuous nature of the government's evidence that Devries entered into an agreement to manufacture methamphetamine and that he did so on the date alleged. The two officers who conducted surveillance of Devries's property did not see any methamphetamine being made, and none of the government witnesses other than Mosset testified that Devries was involved in manufacturing methamphetamine on or around April 8. Moreover, no evidence identified Devries as the person who made the methamphetamine found in the searches.

The government points to the evidence that methamphetamine could have been manufactured on Devries's property and argues that the district court erred in failing to consider his liability under an aiding and abetting theory, on which the jury had been instructed.  Liability under that theory requires the government to prove that a defendant associated himself with and participated in an unlawful venture in a way that shows he wished to bring it about, and that he acted to make the venture succeed.  United States v. Ironi, 525 F.3d 683, 690 (8th Cir. 2008).  Although the district court did not speak directly of an aiding and abetting theory, its thorough review and consideration of the evidence make it clear that the government could not sustain its burden.  We are mindful of the discretion granted to the district court, which is so "broad in that it may weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict."  United States v. Dodd, 391 F.3d 930, 934 (8th Cir. 2004) (internal quotation and citation omitted).

## II.

The government also argues that the district court gave too much weight to the apparent inconsistencies in the evidence without considering other pieces of evidence that could be reconciled, and that certain inconsistencies in Mosset's testimony do not negate his plausibility in general.  The argument is without merit.  The inconsistent evidence came from the government's own witnesses, and it is up to the district court to evaluate credibility and determine the appropriate weight of various pieces of evidence.  The district court committed no error in that process.

The district court explained that it found Mosset's credibility to be low for reasons beyond the inconsistency in testimony and his fuzzy memory due to "a seemingly insatiable methamphetamine addiction."  Mosset has a "deceitful and generally nefarious character . . . [and] a reputation for dishonesty."  His landlord testified that he does not trust Mosset; Mosset repeatedly lied to his wife; he deceived his mother by surreptitiously hiding methamphetamine lab components on her

property; and he attempted to deceive the Court. As a result, the district court had "great difficulty accepting any of Mosset's testimony, a conclusion only bolstered by his extensive criminal history, including a felony sex offense against a child, his testimony that his memory was impaired on the night in question due to withdrawal pains from methamphetamine, and his incentive to provide incriminating testimony stemming from his plea agreement with the Government."

The district court conducted a thorough review of the evidence, and we find no error in its conclusion that a new trial should be granted in the interest of justice. The district court's judgment is AFFIRMED.

_____